Dear Senator McPherson:
You have requested an opinion of the Attorney General regarding whether a firearm can be legally secured inside a vehicle at one's workplace pursuant to La.R.S. 32:292.1 and any other applicable State or federal law. You specifically inquire about La.R.S. 32:292.1 and the possible conflicts with the federal Occupational Safety and Health Act ("OSHA"), [1] the Maritime Transportation Security Act of 2002 ("MTSA"), [2] and the Chemical Facility Anti-Terrorism Standards ("CFATS"), [3] including any safety plans submitted pursuant to these federal laws.
La.R.S. 32:292.1 states as follows:
 A. Except as provided in Subsection D of this Section, a person who lawfully possesses a firearm may transport or store such firearm in a locked, privately-owned motor vehicle in any parking lot, parking garage, or other designated parking area. *Page 2 
 B. No property owner, tenant, public or private employer, or business entity or their agent or employee shall be liable in any civil action for damages resulting from or arising out of an occurrence involving a firearm transported or stored pursuant to this Section, other than for a violation of Subsection C of this Section.
 C. No property owner, tenant, public or private employer, or business entity shall prohibit any person from transporting or storing a firearm pursuant to Subsection A of this Section. However, nothing in this Section shall prohibit an employer or business entity from adopting policies specifying that firearms stored in locked, privately-owned motor vehicles on property controlled by an employer or business entity be hidden from plain view or within a locked case or container within the vehicle.
 D. This Section shall not apply to:
 (1) Any property where the possession of firearms is prohibited under state or federal law.
 (2) Any vehicle owned or leased by a public or private employer or business entity and used by an employee in the course of his employment, except for those employees who are required to transport or store a firearm in the official discharge of their duties.
 (3) Any vehicle on property controlled by a public or private employer or business entity if access is restricted or limited through the use of a fence, gate, security station, signage, or other means of restricting or limiting general public access onto the parking area, and if one of the following conditions applies:
 (a) The employer or business entity provides facilities for the temporary storage of unloaded firearms.
 (b) The employer or business entity provides an alternative parking area reasonably close to the main parking area in which employees and other persons may transport or store firearms in locked, privately-owned motor vehicles.
Based upon the foregoing, it is necessary to consider whether federal laws, or any plans submitted pursuant to them, conflict with and/or preempt this statute. La.R.S. 32:292.1(D)(1) explicitly provides that section 292.1 shall not apply to any property where the possession of firearms is prohibited under State or federal law, which illustrates that the Louisiana Legislature did not intend for this law to interfere with any prohibitions of *Page 3 
the transportation and storage of firearms in privately owned vehicles that exist under State or federal law aside from La.R.S. 32:292.1.
 GENERAL LAW AND PREEMPTION
Your question involves the issue of preemption which derives from Article VI of the United States Constitution. Also known as the Supremacy Clause, Article VI provides that the "Laws of the United States . . . shall be the supreme Law of the Land." Therefore, any state law that conflicts with federal law has no effect.[4] However, "[c]onsideration of issues arising under the Supremacy Clause `start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless [there is] the clear and manifest purpose of Congress.'"[5]
The United States Supreme Court has set forth three tests that it uses to determine if a state statute has been preempted or superseded. The first test is whether or not the scheme of federal regulation is so pervasive that Congress left no room for the states to supplement it.[6] This preemption is normally accomplished by the federal government using express or explicit preemptive language in a given statute. The second test is whether the federal laws touch a field in which the federal interest is so dominant that the federal system must be assumed to preclude enforcement of state laws on the same subject.[7] This type of preemption is commonly called "field preemption." The third test is whether the enforcement of the state statute presents a serious danger of conflict with the administration of a federal program.[8] Conflict preemption occurs when either compliance with both state and federal law is impossible, or a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.[9]
In addition to the federal statutes, we must also consider any regulations promulgated by the agencies in control of or established by OSHA, MTSA, or CFATS. With regard to this *Page 4 
issue, the court in R.J. Reynolds Tobacco Co. v. DurhamCounty, N.C.[10] held that although regulations are not themselves controlling on the preemption issue, [11] when Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis we must consider whether the regulations evidence a desire to occupy a field completely.[12] The court specifically noted that "[f]ederal regulations have no less pre-emptive effect than federal statutes."[13] Preemption should not, however, be inferred simply because an agency's regulations are comprehensive.[14]
Before considering whether or not OSHA, MTSA, and CFATS preempt the Louisiana law governing the transportation and storage of firearms in privately owned vehicles, it is important to note that Louisiana currently has no applicable jurisprudence on this issue. Thus, this matter is res nova not just for this Office, but for the State in general.
 EXPRESS AND CONFLICT PREEMPTION
In the current situation, the first test for preemption results in no conflict because neither OSHA, MTSA, nor CFATS contain any express reference to firearms, much less to storing firearms in one's vehicle.[15] Regarding the second test, an argument for field preemption can be made, but there appears to be no federal interest that is so dominant that the federal system intends to preclude enforcement of state laws on the transportation and storage of firearms in privately owned vehicles. This issue of field preemption will be further addressed below with regard to each individual federal law mentioned above. The third test, conflict preemption, does not pose any problems, because La.R.S. 32:292.1 does not stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, specifically with respect to OSHA, MTSA, and CFATS.
Also, in the current situation, there are no regulations promulgated pursuant to OSHA, MTSA, and CFATS that evidence the intent to expressly preempt state laws governing *Page 5 
the storage of firearms in one's vehicle. None of the federal regulations evidence a desire to occupy the field of firearm storage, much less the storage of firearms in one's vehicle.
Therefore, since there is no express preemption, and allowing individuals to transport and store firearms in their vehicles does not prevent OSHA from achieving its goals of assuring safe and healthy working conditions for employees, [16] MTSA from addressing facility and vessel vulnerability assessments as well as requiring and/or approving facility security plans, vessel security plans, and port vulnerability assessments, [17] or CFATS from enhancing the security of our Nation by lowering the risk posed by certain chemical facilities, [18] it is the opinion of this Office that no express or conflict preemption exists.
 FIELD PREEMPTION
Occupational Safety and Health Act
OSHA is the primary federal law that governs occupational health and safety in the United States.[19] OSHA's main goal is:
 [t]o assure safe and healthful working conditions for working men and women; by authorizing enforcement of the standards developed under the Act; by assisting and encouraging the States in their efforts to assure safe and healthful working conditions; by providing for research, information, education, and training in the field of occupational safety and health; and for other purposes.[20] *Page 6 
This law further states as follows:
 (b) The Congress declares it to be its purpose and policy . . . to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources —
 *** (11) by encouraging the States to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws by providing grants to the States to assist in identifying their needs and responsibilities in the area of occupational safety and health, to develop plans in accordance with the provisions of this chapter, to improve the administration and enforcement of State occupational safety and health laws, and to conduct experimental and demonstration projects in connection therewith.[21]
By Congress expressly stating that its goal with OSHA is"assisting and encouraging States in their efforts to assure safe and healthful working conditions,"[22] and that Congress' purpose and policy is to encourage states "to assume the fullest responsibility for the administration and enforcement of their occupational safety and health laws,"[23] this undoubtedly minimizes any preemption argument against the validity of La.R.S. 32:292.1.
With regard to OSHA, several federal cases directly address the issue raised in this opinion. In Florida Retail Federation,Inc. v. Attorney General of Florida, [24] several businesses challenged Florida's "guns-at-work" statute, which compelled some businesses to allow customers and some workers to have guns secured in their vehicles in businesses' parking lots. In Florida RetailFederation, Inc., the court ultimately held that the Florida Legislature acted within its constitutional authority when it afforded a worker with a concealed carry permit a statutory right to have a gun secured in a vehicle in a parking lot.[25] *Page 7 
The argument raised by the plaintiffs in Florida RetailFederation, Inc., was that OSHA preempts Florida's guns-at-work statute because OSHA provides that an employer: (1) shall furnish to each of his employees employment and a place of employment that are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees; and (2) shall comply with occupational safety and health standards promulgated under OSHA.[26] The plaintiffs asserted that an employer therefore has both a "general duty" under § 654(a)(1) to provide a workplace free of recognized hazards, and a separate duty under § 654(a)(2) to comply with the standards promulgated by the Secretary of Labor using the procedures set forth in 29 U.S.C.A. § 655.[27]
The court in Florida Retail Federation, Inc., ultimately found the Florida guns-at-work statute constitutional, stating that "[t]here are simply no promulgated [OSHA] standards on this subject one way or the other"[28], and that "[b]usinesses thus have no duty under § 654(a)(2) to ban guns from their workplaces."[29] The court further reasoned that "[i]f the failure to ban guns were indeed a violation of the general duty clause, then all businesses would have a duty to ban guns."[30] OSHA states that, "[n]othing in this chapter shall prevent any State agency or court from asserting jurisdiction under State law over any occupational safety or health issue with respect to which no standard is in effect under section 655 of this title."[31] Therefore it is our opinion that, because OSHA has no standard in effect, [32] and because failing to ban guns cannot be construed as a violation of the general duty clause, Louisiana's guns-at-work statute (La.R.S. 32:292.1), like Florida's similar law, is valid and enforceable.
This same OSHA issue was also recently addressed in the federal Tenth Circuit Court of Appeals. In Ramsey WinchInc. v. Henry, that court held that "OSHA has not indicated in *Page 8 
any way that employers should prohibit firearms from company parking lots."[33] The court further noted that OSHA actually declined a request to promulgate a standard banning firearms from the workplace.[34] In declining this request, OSHA stressed reliance on its voluntary guidelines and deference "to other federal, state, and local law-enforcement agencies to regulate workplace homicides."[35] The court in Ramsey Winch Inc., went on to cite jurisprudence that provided, "[t]he OSH Act is not meant to interfere with states' exercise of police powers to protect their citizens."[36] As such, "state laws of general applicability . . . that do not conflict with OSHA standards and that regulate conduct of workers and non-workers alike [are] generally not . . . preempted."[37]
Maritime Transportation Security Act of 2002
The Maritime Transportation Security Act of 2002 was enacted to address port and waterway security.[38] MTSA addresses United States facility and vessel vulnerability assessments, including the identification of weaknesses in physical security, passenger and cargo security, structural integrity, protection systems, procedural policies, communications systems, transportation infrastructure, utilities, contingency response, and other areas as determined by the Secretary of the Department of Homeland Security.[39] MTSA also requires and approves facility security plans, vessel security plans, and port vulnerability assessments.[40] The U.S. Coast Guard issues regulations to implement the provisions of the MTSA.[41]
As with OSHA, no part of the MTSA or regulations created as a result of the Act, make any reference to firearms or employee vehicles, much less does the law or its regulations *Page 9 
evidence an express or implied Congressional desire to occupy the field of firearm storage or storage of firearms in one's vehicle.[42] Thus, it is the opinion of this Office that La.R.S. 32:292.1 is not preempted by the MTSA.
Chemical Facility Anti-Terrorism Standards
The Chemical Facility Anti-Terrorism Standards (CFATS) are federal government security regulations created to enhance the security of our Nation by furthering the mission of the Department of Homeland Security, as provided in 6 U.S.C.A. § 111(b)(1), [43] and by lowering the risk posed by certain chemical facilities.[44] The Department of Homeland Security promulgated the Interim Final Rule for Chemical Facility Anti-Terrorism Standards on April 9, 2007.[45] The regulations went into effect on June 8, 2007.
CFATS regulates many specific activities at chemical facilities, but it is the opinion of this Office that OSHA is the governing force controlling workplace or employee safety and health at chemical facilities. Because the current issue revolves around employee safety, which is primarily within the scope of OSHA and not CFATS, our Office is of the opinion that CFATS does not preempt La.R.S. 32:292.1. *Page 10 
However, even though CFATS is not directly at issue under the current facts, CFATS includes a provision that addresses preemption. 6 C.F.R. § 27.405(d) states as follows:
 (1) Review. The Department [of Homeland Security] may review State laws, administrative actions, or opinions or orders of a court under State law and regulations submitted under this section, and may offer an opinion whether the application or enforcement of the State law or regulation would conflict with, hinder, pose an obstacle to or frustrate the purposes of this Part.
 (2) Opinion. The Department may issue a written opinion on any question regarding preemption. If the question was submitted under subsection (c) of this part, the Assistant Secretary will notify the affected chemical facility and the Attorney General of the subject State of any opinion under this section.
 (3) Consultation with States. In conducting a review under this section, the Department will seek the views of the State or local jurisdiction whose laws may be affected by the Department's review.
Therefore, if CFATS were at issue, Louisiana could have the Department of Homeland Security issue a written opinion on any question regarding preemption. However, it is the opinion of this Office that CFATS deals more with overall security of chemical facilities and threats involving terrorism, not employee safety, which OSHA expressly governs, such a request seems unnecessary.
 PRE-APPROVED FEDERAL SAFETY PLANS
While the law and analysis above illustrate that neither express, field, or conflict preemption exist with regard to employees legally securing firearms inside personal vehicles at one's workplace. A separate issue does, however, arise considering many employers are required to submit independent safety plans pursuant to each of the federal laws mentioned above. This problem exists because many employers have submitted plans that include provisions which prohibit weapons on any part of the employer's property, including personal vehicles in employee parking lots. These plans are already "approved" by the agencies that oversee each of these federal laws, therefore these plans would, in a sense, be "federal law." While each individual plan, which was already approved by the appropriate federal agency, may have been considered "federal law" on July 2, 2008 when La.R.S. 32:292.1 went into effect, the fact of the matter remains that these plans can easily be amended. Employers have had over a year to amend their plans to comply with La.R.S. 32:292.1. *Page 11 
OSHA
With regard to OSHA, employers do not submit safety plans for approval. States may submit plans under 29 U.S.C.A. § 667 to "assume responsibility for development and enforcement therein of occupational safety and health standards relating to any occupational safety or health issue." While that is the case, only plans submitted by employers are at issue here and Louisiana has not yet submitted a plan to OSHA under 29 U.S.C.A. § 667.
MTSA 46 U.S.C.A. § 70103(c)(3) states that "[a] security plan required under this subsection shall-(A) be consistent with the requirements of the National Maritime Transportation Security Plan and Area Maritime Transportation Security Plans." Section 70103 further states that:
 (c)(4) The Secretary [of the Department of Homeland Security] shall —
 (A) promptly review each such plan;
 (B) require amendments to any plan that does not meet the requirements of this subsection;
 (C) approve any plan that meets the requirements of this subsection; and
 (D) subject to the availability of appropriations, verify the effectiveness of each such facility security plan periodically, but not less than 2 times per year, at least 1 of which shall be an inspection of the facility that is conducted without notice to the facility.
Since 46 U.S.C.A. § 70103(c)(4)(C) expressly states that the Secretary "shall approve any plan that meets the requirements of this subsection" and amending security plans to allow employees to transport or store firearms in a locked, privately-owned motor vehicles does not interfere with the requirements of this subsection, any employer may submit such amendments of a security plan to the Department of Homeland Security, which would easily allow compliance with both State and federal law. Because La.R.S. 32:292.1 does not pose an obstacle to the accomplishment of the purpose of MTSA, it follows that MTSA does not preempt this State law allowing the transportation and/or storage of firearms in a locked, privately-owned motor vehicle. This Office does, however, acknowledge that the Department of Homeland Security and United States Coast Guard's authority to implement more rigorous security measures in times of heightened security at certain facilities may preempt La.R.S. 32:292.1. *Page 12 
CFATS 6 C.F.R. § 27.245 (a)(2) states that "[t]he Department [of Homeland Security] will not disapprove a Site Security Plan submitted under this Part based on the, presence or absence of a particular security measure. The Department may disapprove a Site Security Plan that fails to satisfy the risk-based performance standards established in § 27.230.
6 C.F.F. § 27.230 states, in pertinent part, as follows:
 (a) Covered facilities must satisfy the performance standards identified in this section. The Assistant Secretary will issue guidance on the application of these standards to risk-based tiers of covered facilities, and the acceptable layering of measures used to meet these standards will vary by risk-based tier. Each covered facility must select, develop in their Site Security Plan, and implement appropriately risk-based measures designed to satisfy the following performance standards:
 (1) Restrict Area Perimeter. Secure and monitor the perimeter of the facility;
 (2) Secure Site Assets. Secure and monitor restricted areas or potentially critical targets within the facility;
 (3) Screen and Control Access. Control access to the facility and to restricted areas within the facility by screening and/or inspecting individuals and vehicles as they enter, including,
 (i) Measures to deter the unauthorized introduction of dangerous substances and devices that may facilitate an attack or actions having serious negative consequences for the population surrounding the facility; and
 *** (14) Specific Threats, Vulnerabilities, or Risks. Address specific threats, vulnerabilities or risks identified by the Assistant Secretary for the particular facility at issue;
Under CFATS, the Department may disapprove a Site Security Plan that fails to satisfy the risk-based performance standards established in § 27.230, however, CFATS does not include any discussion of firearms in its "risk-based performance standards" provided above. While restricting the area perimeter, securing site assets, and screening and *Page 13 
controlling access to facilities are considered risk-based performance standards, there is no Federal law that illustrates the congressional intent necessary to preempt La.R.S. 32:292.1.
In further support of this notion, in May 2009, the Department of Homeland Security, Office of Infrastructure, Protection Infrastructure Security Compliance Division released a "guidance document," that offers non-exclusive examples for facilities to consider as part of their overall strategy to address the risk-based performance standards under Chemical Facility Anti Terrorism Standards. In this "guidance document," entitled Risk-Based Performance Standards Guidance — Chemical Facility Anti-Terrorism Standards May 2009, [46] Risk Based Performance Standard 2 ("RBPS 2") provides guidance on how to secure site assets as well as monitor restricted areas or potentially critical targets within the facility.
This document further provides that:
 [t]he purpose of RBPS 2-Secure Site Assets is to secure and monitor restricted areas or potentially critical targets (i.e., critical assets) . . . Critical assets may include not only locations where [chemicals of interest] are manufactured, stored, or used but also other sensitive assets, such as process controls, security operations centers, and critical cyber systems.
In implementing RBPS 2, the guidance document further states that:
 [p]rotective measures or additional controls are used to detect unauthorized presence; observe unauthorized behaviors; or determine the presence of prohibited items, such as firearms or explosives. Effectively securing critical assets may also involve the installation of additional physical barriers, such as internal fences, security enclosures, additional access-control requirements, or special security procedures."
It is therefore clear that the Department of Homeland Security expects facility security plans to monitor "critical targets" and "critical assets," for the unauthorized presence of firearms but makes no mention of a restriction on the transportation or storage of firearms in locked, privately-owned motor vehicles, in employee or customer parking lots.
In instances where access to facilities is restricted or limited through the use of a fence, gate, security station, signage, or other means of restricting or limiting general public access onto the parking area, La.R.S. 32:292.1 (D)(3) clearly provides all employers and *Page 14 
facilities the option of (1) providing a place for employees and others to temporarily store their firearms while at the facility, or (2) providing a reasonably close alternative parking area where these same individuals could transport or store firearms in locked, privately-owned motor vehicles.
With regard to Risk Based Performance Standard 3 ("RBPS 3") and parking security measures, the guidance document states that:
 [b]y limiting or managing parking on-site, a facility can help minimize ease of access to critical assets located inside the facility's perimeter. While one option is to completely prohibit on-site parking, less extreme measures are available, such as limiting on-site parking to certain vehicle classes — for example, by allowing only "corporate" vehicles or only full-time employees' vehicles on-site (i.e., no visitor or contractor parking within the facility perimeter). Another option is to allow parking on-site but locate it a significant distance away from the critical assets and prevent means of vehicular egress to the critical assets.
While considering the guidance of the Department of Homeland Security in conjunction with the alternative options offered by La.R.S. 32:292.1(3), it is the opinion of this Office that any security plans submitted pursuant to or required by CFATS may easily comply with both State and federal law. Because La.R.S. 32:292.1 does not pose an obstacle to the accomplishment of the purpose of CFATS, it follows that CFATS does not preempt this State law allowing the transportation and/or storage of firearms in a locked, privately-owned motor vehicle. As stated above with regard to MTSA, this Office does, however, acknowledge that the Department of Homeland Security's authority to implement more rigorous security measures in times of heightened security at certain facilities may preempt La.R.S. 32:292.1.
 CONCLUSION
Based upon the foregoing analysis, it is the opinion of this Office that because there appear to be no express, field, or conflict preemption issues involving La.R.S. 32:292.1, with regard to OSHA, MTSA, or CFATS, that La.R.S. 32:292.1 remains valid and enforceable. In addition, all security and safety plans of Louisiana companies that interfere with the right to transport or store firearms in privately owned vehicles must be adjusted to conform with Louisiana law. These plans are submitted by private, corporate, or governmental entities and do not amount to a congressional intent to preempt State law. Precedent holds that "the historic police powers of the States [are] not to be superseded by the federal act unless that was the clear and manifest purpose of *Page 15 
Congress."[47] Because there is no clear and manifest purpose of Congress to preempt state law governing the storage of firearms in one's own vehicle, La.R.S. 32:292.1 is not preempted by any of the federal laws mentioned above.[48] In addition, because the laws governing OSHA, MTSA, and CFATS do not currently require that security plans submitted pursuant to each ban the transportation and/or storage of firearms in privately owned vehicles, any current plans that do not comply with La.R.S. 32:292.1 must be amended accordingly.
We trust this adequately responds to your request. If you should have any questions about the response contained herein, please feel free to contact our office.
 Yours very truly,
 JAMES D. "BUDDY" CALDWELL
 ATTORNEY GENERAL
 BY: __________________________ DANIEL D HENRY JR. Assistant Attorney General
 JDC/DDH/jv
[1] 29 U.S.C.A. § 651, et seq.
[2] 46 U.S.C.A. § 2101, et seq.
[3] 6 C.F.R. § 27.100, et seq. § 27.100 states that "[t]he purpose of [the Chemical Facility Anti-Terrorism Standards] is to enhance the security of our Nation by furthering the mission of the Department [of Homeland Security] as provided in 6 U.S.C.A. § 111(b)(1) and by lowering the risk posed by certain chemical facilities."
[4] Cipollone v. Liggett Group, Inc.,505 U.S. 504, 516(1992).
[5] Id. (quoting Rice v. Santa Fe Elevator Corp.,331 U.S. 218, 230 (1947)).
[6] Wisconsin Public Intervenor v. Mortier, 501 U.S. 597(1991).
[7] Com. of Pa. v. Nelson, 350 U.S. 497 (1956), reh'gdenied, 351 U.S. 934 (1956) (involving the question whether the federal Smith Act superseded a state sedition statute, which question was answered in the affirmative).
[8] Id.
[9] Gade v. National Solid Wastes Management Ass'n,505 U.S. 88 (1992); Mortier, supra.; California CoastalCom'n v. Granite Rock Co., 480 U.S. 572 (1987).
[10] 479 U.S. 130, 149(1986).
[11] See Xerox Corp. v. County of Harris,459 U.S. 145, 152, n. 8 (1982).
[12] See Fidelity Federal Savings Loan Assn. v. De laCuesta, 458 U.S. 141, 153-154 (1982).
[13] Id. at 153.
[14] Reynolds Tobacco Co, supra, at 149. See HillsboroughCounty v. Automated Medical Laboratories, Inc.,471 U.S. 707, 716-718 (1985).
[15] See generally, 29 U.S.C.A. § 651, etseq, 46 U.S.C.A. § 2101, etseq, 6 C.F.R. § 27.100, et seq.
[16] PL91-596, December 29, 1970, 84 Stat. 1590, enacting 29 U.S.C.A. § 651, etseq.
[17] 46 U.S.C.A. § 70103.
[18] 6 U.S.C.A. § 111 establishes the Department of Homeland Security. The Department's primary mission is to investigate and prosecute terrorism crimes as well as: (A) prevent terrorist attacks within the United States; (B) reduce the vulnerability of the United States to terrorism; (C) minimize the damage, and assist in the recovery, from terrorist attacks that do occur within the United States; (D) carry out all functions of entities transferred to the Department, including by acting as a focal point regarding natural and manmade crises and emergency planning; (E) ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress; (F) ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland; (G) ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland; and (H) monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking.
[19] 29 U.S.C.A. § 651, et seq.
[20] PL91-596, December 29, 1970, 84 Stat. 1590, enacting 29 U.S.C.A. § 651, etseq.
[21] 29 U.S.C.A. § 651.
[22] Id. (emphasis added).
[23] Id.
[24] 576 F.Supp.2d 1281 (N.D.FIa. 2008).
[25] Id., at 1300.
[26] 29 U.S.C.A. § 654.
[27] Florida Retail Federation, Inc., 576 F.Supp.2d at 1297.
[28] Id., at 1298.
[29] Id.
[30] Id.
[31] 29 U.S.C.A. § 667 (a).
[32] In support of the proposition that OSHA has no standard in effect, Footnote 9 from Ramsey Winch Inc. v. Henry,555 F.3d 1199 (C.A.10 2009) points out that OSHA recently issued a letter to Oklahoma State Senator Jerry Ellis stating that "[g)un related violence is not a recognized occupational hazard in industry as a whole" and that "[OSHA] do[es] not believe that, as a general matter, the general duty clause of the OSH Act preempts [the Oklahoma Amendments]." Letter from Thomas Stohler, Acting Assistant Secretary of Labor, to Jerry Ellis, Oklahoma State Senate (Jan. 16, 2009).
[33] Ramsey Winch Inc. v. Henry, supra, at 1206.
[34] See OSHA Std Interp 1900 (September 13, 2006), also available at 2006 WL 4093048.
[35] Id.
[36] Ramsey Winch Inc., supra, at 1206, citing Lindsey v.Caterpillar, Inc.,480 F.3d 202, 208 (3rd Cir. 2007); see alsoGade v. National Solid Wastes Management Ass'n,505 U.S. 88, 96 (1992) (noting "[f]ederal regulation of the workplace was not intended to be all encompassing"); FloridaRetail Federation, Inc., supra, at 1298.
[37] Ramsey Winch Inc., supra, at 1206; citingGade, supra, at 107.
[38] 46 U.S.C.A. § 2101, et seq.
[39] 46 U.S.C.A. § 70102 (b).
[40] 46 U.S.C.A. § 70103.
[41] Title 33 of the Code of Federal Regulations, which includes the Coast Guard regulations, contains all regulations pertaining to navigation and navigable waters.
[42] The Code of Federal Regulations for Navigation and Navigable Waters does reference the possession of loaded firearms at a United States Army Corps of Engineers facility in Cape Cod Canal, Massachusetts. On that topic, 33 C.F.R. § 207.20 (q) (10) states that "[t]he possession of loaded firearms, ammunition, projectile firing devices, bows and arrows, crossbows, and explosives of any kind is prohibited unless in the possession of a law enforcement officer or Government employee on official duty or used for hunting during the hunting season as permitted under paragraph (q)(6) of this section, or unless written permission has been received from the division engineer." It should be noted that this regulation only references the actual possession of a loaded firearm on one's person and does not address the issue at hand, storage of unloaded firearms in one's vehicle. Further, because this regulation is strictly limited to one facility and is not necessarily tied to the MTSA, its existence does not impact the issues raised herein.
[43] 6 U.S.C.A. § 111 establishes the Department of Homeland Security. The Department's primary mission is to investigate and prosecute terrorism crimes as well as: (A) prevent terrorist attacks within the United States; (B) reduce the vulnerability of the United States to terrorism; (C) minimize the damage, and assist in the recovery, from terrorist attacks that do occur within the United States; (D) carry out all functions of entities transferred to the Department, including by acting as a focal point regarding natural and manmade crises and emergency planning; (E) ensure that the functions of the agencies and subdivisions within the Department that are not related directly to securing the homeland are not diminished or neglected except by a specific explicit Act of Congress; (F) ensure that the overall economic security of the United States is not diminished by efforts, activities, and programs aimed at securing the homeland; (G) ensure that the civil rights and civil liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland; and (H) monitor connections between illegal drug trafficking and terrorism, coordinate efforts to sever such connections, and otherwise contribute to efforts to interdict illegal drug trafficking.
[44] 6 C.F.R. § 27.100.
[45] 6 C.F.R. § 27.100, et seq.
[46] The Risk-Based Performance Standards Guidance — Chemical Facility Anti-Terrorism Standards May 2009 are located on the Department of Homeland Security's website at: http://www.dhs.gov/xlibrary/assets/ chemsec_cfats_riskbased_performance_standards.pdf
[47] Altria Group,Inc. v. Good, ___U.S. ___,129 S.Ct. 538, 543, (2008) (quotingRice v. Santa Fe Elevator Corp.,331 U.S. 218, 230 (1947)).
[48] This includes any safety/security plans submitted pursuant to each.